Filed 7/28/23  P. v. Christman CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>BRUCE ALLEN CHRISTMAN,<br><br>　　　Defendant and Appellant. | B321145<br><br>(Los Angeles County<br>Super. Ct. No. TA154545) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hector E. Gutierrez, Judge.  Affirmed.

Christopher Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Bruce Allen Christman contends that his convictions for assault with a firearm, assault with a semiautomatic firearm, and unlawful possession of a firearm must be reversed because the prosecution exercised peremptory challenges in a discriminatory fashion during his jury trial. Substantial evidence supports the trial court's conclusion that appellant did not make a prima facie showing of discriminatory intent. We accordingly affirm.

## FACTUAL BACKGROUND

On May 20, 2021, appellant and one of his two roommates, J.D.,[1] were involved in an argument during which J.D. was shot in the leg. The three roommates gave varying accounts of the incident at trial.

According to J.D., appellant fired several shots in his direction with a derringer handgun. J.D. responded by throwing a garden shovel at appellant. Appellant then picked up a Glock pistol and shot J.D. in the lower leg.

The third roommate witnessed the incident. He testified that appellant fired a "pellet gun" at J.D. twice. Appellant then picked up a black Glock and fired about three shots at J.D.'s leg, striking him. After J.D. was hit, he lunged at appellant with a shovel.

Appellant testified that he turned to look at J.D. after he heard J.D. yelling at him and saw J.D. holding a black gun in his right hand. Appellant reached over, grabbed J.D.'s right wrist or hand, and pushed his arm down. The gun "went off" while it was in J.D.'s hand. J.D. then dropped the gun; appellant picked it up

---

[1]    We refer to the victim using initials to protect his privacy. (See Cal. Rules of Court, rule 8.90(b)(4).)

2

and put it in his pocket. Appellant also pocketed a small derringer that was lying nearby before leaving the residence.

A police officer testified that appellant had a Glock in his pocket and a derringer in his sock when he was arrested later in the day.

## PROCEDURAL HISTORY

An information filed on August 30, 2021 charged appellant with one count of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b), count 1),[2] one count of assault with a firearm (§ 245, subd. (a)(2), count 2), and two counts of unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1), counts 3 and 4). The information alleged that appellant personally inflicted great bodily injury on J.D. during the commission of count 1 (§ 12022.7, subd. (a)) and personally used a firearm during both counts 1 and 2 (§ 12022.5, subd. (a)). It further alleged that appellant suffered a prior strike conviction (§§ 667, subds. (b)-(j), 1170.12, subd. (b)) and a prior serious or violent felony conviction (§§ 667.5, subd. (c), 1192.7).

On December 16, 2021, a jury found appellant guilty as charged and found the personal use and great bodily injury enhancements true. Appellant subsequently admitted his priors. The court struck appellant's strike and sentenced him to the high term of nine years on count 1, plus consecutive terms of three years for the great bodily injury enhancement and four years for the personal use enhancement. It imposed and stayed sentence on count 2 pursuant to section 654 and imposed consecutive terms of eight months each on counts 3 and 4.

Appellant timely appealed.

---

[2]   All further statutory references are to the Penal Code unless otherwise indicated.

3

**DISCUSSION**

Appellant's sole contention on appeal is that the trial court erred in denying his *Batson/Wheeler*[3] motion during jury selection.  He argues that the prosecutor's striking of Black prospective jurors gave rise to an inference of discrimination, and the trial court erred by finding no prima facie case had been established.  We disagree.

## I.    Background

The pool of approximately 70[4] prospective jurors in this case was unevenly divided into two groups. Group A included 27 prospective jurors; and Group B included 43 to 45 prospective jurors.  One prospective juror in Group A was Black, and three prospective jurors in Group B were Black.  The racial makeup of the remainder of the pool is not clear.

### A.    Juror 0468

Juror No. 0468, a Black woman, was in Group A. Juror No. 0468 was single, lived in Compton, and worked as a licensed vocational nurse.  She had no prior jury experience and had never been a victim of a crime.  In response to a direct question from

---

[3]    *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, overruled in part by *Johnson v. California* (2005) 545 U.S. 162 (*Wheeler*).  Recently enacted Code of Civil Procedure section 231.7, which significantly modifies the *Batson/Wheeler* framework, is not relevant here because it applies only to criminal trials in which jury selection began on or after January 1, 2022.  (See Code Civ. Proc., § 231.7, subds. (i), (k).) Jury selection in this case began on December 3, 2021.

[4]    The appellate record does not support appellant's assertion that "[t]here were more than 85 total prospective jurors."

4

the court, she stated that she would not change her vote to end deliberations more quickly.

During defense counsel's voir dire of Group A, Juror No. 0468 raised her hand to indicate that she could follow the law as provided by the court. Defense counsel did not directly engage Juror No. 0468 in any additional colloquy or questioning.

During the prosecutor's voir dire of Group A, Juror No. 0468 agreed that a witness who made three different statements about an event would be inconsistent. Later, the prosecutor asked if anyone disagreed with "the idea that self-defense, the use of force has to be proportional to what is being used on you." Another prospective juror, Juror No. 1943, said he disagreed and made the following remarks:

"Well, since 911, what happened on the plane it is - - it's - - you cannot, unfortunately, give in to your attacker. You must stop your attacker completely, period. And I think 911 proved that. Because no matter what you did or thought or how you felt about it, they were going to down that plane with you in it and everybody else. So the lesson to me is when you're faced in a situation like that, you must stop them. Save your life, but stop them in the tracks. In other words, you've got to kill them. You have to kill them. And that's the lesson that I draw from 911."

After the prosecutor stated—and Juror No. 1943 agreed—that "911 is a pretty rare circumstance," Juror No. 1943 added, "It doesn't have to be. You know, I mean, we're subject to attack." The prosecutor then asked Juror No. 1943 if he believed in "a right to extreme self defense," meaning "[y]ou have the right to kill someone should you feel in danger." Juror No. 1943 clarified that he "wouldn't go that far" where "somebody . . . is just going to rob you." He added, "It's all proportional . . . . You've got to look

5

at the situation. You've got to look at the factors.  You know, how much threat are they, you know, bringing against you?  What is their intent?  You know, so like in a war situation, it's kill or be killed.  In the terrorist situation, the same applies.  But out here in the civil world, you know, you're not going to find that all the time."

Shortly after these remarks, the prosecutor noted that Juror No. 0468 was "giving me a look that makes me think you've got something to say."  Juror No. 0468 said she did, and stated, "He used the reference in the 911 situation.  Why can't you apply the same thing?  In a civil situation, as to what he was referring with the 911, why couldn't you subdue them?"

The prosecutor asked, "Okay.  So am I understanding that you think if you feel threatened, you have the right to kill someone?" Juror No. 0468 answered, "What I feel about that is if you are in a situation and you feel that your life is either [*sic*] coming to an end, I say fight for your life."  The prosecutor said, "Uh-huh." Juror No. 0468 then concluded, "It's fight or flight."

The prosecutor then asked the rest of the prospective jurors if anyone disagreed with Juror No. 0468.  One person stated that flight is a good option in some cases, but "if you don't have the option to run away, fighting seems fair."  Several others agreed; one added, "I don't believe you need to have some calculus going on about what is proportional. You have a right to self-defense within reason. And that would be more my question, was it within reason."  The prosecutor said he agreed with that before shifting the focus.  Juror No. 0468 did not participate in this discussion or make any further remarks.  The prosecutor did not ask her any additional questions.

After the prosecutor and defense counsel made their challenges for cause, the court gave them an opportunity to exercise their peremptory challenges on the Group A jurors. The prosecutor used his first peremptory challenge to excuse Juror No. 0468.

**B.      Juror No. 3841**

Juror No. 3841, a Black man, was in Group B. Group B was not present during the voir dire of Group A.

Juror No. 3841 was single, lived in Compton, and worked as a warehouse clerk. He had no prior jury experience. He initially stated that he had never been the victim of a crime, but subsequently said that he had twice been the victim of a car break-in. Juror No. 3841's brother suffered a conviction related to an unregistered firearm approximately 25 years earlier; Juror No. 3841 said that would not affect his ability to be fair.

During defense counsel's voir dire, she directly asked Juror No. 3841 if he could judge credibility. The following exchange ensued:

Juror No. 3841:  No.

Defense counsel:  You can't?

Juror No. 3841:  No.

Defense counsel:  Tell me why.

Juror No. 3841:  Well, it depends on what it is. I mean - -

Defense counsel: I'm so sorry. I cannot hear you.

Juror No. 3841:  … It depends on what it - - because if I don't know him, I don't know. I mean, I can't.

Defense counsel:  I'll give you the same hypothetical I gave Juror. No. 8.

Juror No. 3841: Yeah.

7

Defense counsel:  If the witness standing at this door says this is what happened to me.  Right?  Standing right here.  Then the witness gets up on the witness box and goes no, no, no, this is how it really happened.  Is that consistent?

Juror No. 3841:  No.

Defense counsel: Okay. So inconsistency, would you agree, is a factor of whether that witness is credible or not?

Juror No. 3841: I'm not sure I understand the - -

Defense counsel:  He gives two different version of what happened.

Juror No. 3841:  So he wouldn't be credible.

Defense counsel:  Would he be credible to you?

Juror No. 3841: No.

Defense counsel:  Okay. I mean, if you're a beating [*sic*] man and someone says to you the Lakers are absolutely going to beat on the Clippers, and then five minutes later he says the Lakers are not going to beat the Clippers, he's giving you two different statements.  Do you trust his word?

Juror No. 3841: No.

The exchange concluded due to a scheduled break in the proceedings.  When Group B returned to the courtroom, the court addressed the group as a whole:

"Ladies and gentlemen, before I turn it back to [defense counsel], I just wanted to touch on something because she's asked this question a couple of times, and I've kind of noticed the responses from a couple of jurors.

"The question is can you judge credibility.  And let me just tell you, we judge credibility every day of our lives.  All right.  A trail [*sic*] is no different. It's in the context of this courtroom and the proceeding.  But the factors to judge credibility.  We use them

8

every day.  I just want to give you a quick example so you understand."

The court then provided an example of buying steak, and evaluating the butcher's recommendation of the most expensive steak on display.  The court continued, "You obviously looked at what this person is saying.  You consider the fact he's selling you steak.  They want to earn a profit.  Right? You're considering all these things.  The motivation for him saying you want to get the expensive steak or whatever.  All these things [defense counsel] is asking about, can you judge credibility.  You do these things every day of your life. You may bring up examples of your kids. It can be in a relationship. It can be at work.  So when she asks can you judge credibility, you do it every single day."

Defense counsel resumed her colloquy with Juror No. 3841 immediately after the court's remarks.

Defense counsel:  In your personal life and everything, can you tell if someone is telling the truth?

Juror No. 3841:  No.

Defense counsel:  I didn't hear you.

Juror No. 3841:  No.

Defense counsel:  No.  Okay.  Can you tell if someone is telling a lie?

Juror No. 3841:  No.  No, I can't.

Defense counsel: Okay. What are the factors that you would consider if someone is not telling the truth?  That you would consider.

Juror No. 3841:  If they were telling the truth? Telling truth?

Defense counsel:  Yes.  What would you – give me a factor.

Juror No. 3841:  I don't know. I wouldn't know.  Because if you don't know the person, you wouldn't be able to – I would just have to accept what they're telling me.

Defense counsel:  So if a witness gets up on the stand and they tell you how something happened one day, but then switches the story the next day, would you be able to tell that person is –

Juror No. 3841:  Yeah.  Well, yeah.  That's different.

The prosecutor revisited this topic with Juror No. 3841 during his voir dire.

Prosecutor:  You said that you have some difficulty determining credibility of witnesses.  Can you tell me a little bit more about that.

Juror No. 3841: Credibility?

Prosecutor: Let me put a finer point on that.  Can you tell when people are lying to? [*sic*]

Juror No. 3841: No.  If I don't know them, I don't know.  Say if somebody - - I have to take their word for it until I get something to counter it.  If somebody walk [*sic*] up and say, you know, he's whatever, and then I would have to make my judgment through that.

Prosecutor:  Okay.  So no one in this case presumably is going to be someone that you know. But all of them are going to testify and swear to tell the truth. And you're going to have to determine what happened. And you might run into two conflicting stories, and you're going to have to sort out which one of these is true.  Do you think you're going to be able to do that?

Juror No. 3841:  Yeah.

Prosecutor:  Now, you said you had problems telling when people are lying.  What makes you think you can do this?

Juror No. 3841:  Like I said, I would have to hear what they say and then take it from there.  Like I said, I don't know if they're lying or not until I hear what they say.

Prosecutor:  Okay.  I understand you now.  All right.  So you can't judge someone just based on their appearance whether they're telling the truth?

Juror No. 3841:  Right.

Prosecutor: So you would take all witnesses coming to the stand on the exact same level.

Juror No. 3841:  Yeah.

Prosecutor:  All right.  And you would listen to what they're saying.  And then after that, would you be able to tell what they said made sense?

Juror No. 3841: Yeah.

Neither the prosecutor nor defense counsel sought to excuse any Group B jurors for cause.  The prosecutor used his second peremptory challenge for Group B to excuse Juror No. 3841.  After defense counsel accepted the panel, the prosecutor used his next peremptory challenge to excuse Juror No. 8294, a Black man who also said he had difficulty assessing credibility.[5]

---

[5] The prosecutor engaged in a colloquy about credibility with Juror No. 8294, who lived in Los Angeles with his parents and brother and was unemployed but previously had worked at the post office.  Juror No. 8294, who happened to be seated next to Juror No. 3841, said he could not tell when people are lying, he had difficulty evaluating competing stories in his daily life, and he did not think he would be able to evaluate evidence in the case if he heard two conflicting stories.  Although Juror No. 8294 was subject to the *Batson/Wheeler* motion below, appellant does not challenge the exercise of the prosecutor's peremptory challenge against Juror No. 8294 on appeal.

### C.   *Baston/Wheeler* Motion

After the prosecutor excused Juror No. 8294, defense counsel made a *Batson/Wheeler* motion at sidebar.  Defense counsel stated that she did not "believe there's an objective reason as to why he's been excused. . . .  I believe the People now have used two peremptories and two Black males have been excused. And I believe in Group A, which have [*sic*] a Black female, was excused also.  So I waited all the way until this third one."

The court observed that the prosecutor had exercised a total of six peremptory challenges across both groups, and that three of them had been used to strike Black jurors.  It also summarized the biographical information those jurors had provided, which we summarized above.

The court continued, "At present, I do not see any other African-American jurors in seats 1 through 12, and I believe that my recollection tells me there's perhaps one male in the audience who's not yet called that remains in the audience.  Okay.  But that's it.  So I want to be clear in how I state this.  I'm not finding a prima facie case at this time that [the prosecutor's] exercise of his peremptories is improperly based on race.  But based on my status [*sic*] of the law, now I need to you to state the reasons why and make a record as such."

The prosecutor stated that he struck Juror No. 0468 because "she indicated she would be supportive of a self-defense [*sic*] to a fairly extreme degree.  When one juror went on about responding in a lethal fashion to self-defense and then walking it back to say but that's qualified, her response was incredulous and indicated she would be friendly to someone responding to regular force with lethal force."

12

Regarding Juror No. 3841, the prosecutor explained that during defense counsel's voir dire, "he indicated that he had difficulty judging credibility. He was slow to respond to the hypothetical questions, indicating that he wasn't understanding quite what was going on. He said he couldn't determine if people were telling him the truth. If he doesn't personally know the person, he didn't know they were lying, which made me think he might be a poor juror in deliberations when asked to adjudicate the credibility of witnesses."

As to Juror 8294, the prosecutor said, "I kicked him for very similar reasons. He said he couldn't tell if someone was telling the truth. . . . He had difficulty evaluating the testimony, which is why I exercised that peremptory challenge."

The court asked defense counsel if she would like to make a record. She stated, "Just that in terms of the last two Black male jurors, I don't think they're [*sic*] hesitancy in automatically saying they can judge someone whether they're lying or truthfulness, I don't think it makes them not believable. Other jurors said the same thing. A peremptory should not be used for that. . . . I work with [the prosecutor] a lot. I admire him. I'm doing this merely in representing Mr. Christman. I don't think there's uncertainty that they can judge credibility is enough of a reason to kick them out just because of what they said because there are other jurors who said the same thing. I think specifically they're African-Americans is a factor."

The court said it wanted to make a record as well. It stated, "The court observed that the last two jurors that [the prosecutor] kicked. Specifically the juror that was 3841, when [defense counsel] asked him directly can you judge credibility, he said no. And the only reason I bring this up is there was a female juror, I

believe formally [*sic*] seated in 8 . . . I think you [the prosecutor] might have excused her." The parties agreed that the prosecutor had struck that juror, who was single, worked in sales and marketing, and said she had been a victim of domestic violence. The court said that defense counsel had asked that prospective juror if she could judge credibility, and that she had responded no. "That was her first answer. And then you went through some voir dire. . . . Juror 3841, who was the first individual that [the prosecutor] kicked, when you asked him can you judge credibility, he said no. That's why when we came back from the break, I said can I talk to them real quick, [defense counsel], about judging credibility. . . . That stood out to me because they both seemed to indicate off the back [*sic*] 'I can't judge credibility.'"

The court continued, "And I have to say, despite the questioning, I don't know if for Juror No. 3841, the first individual that [the prosecutor] excused, . . . if it was the certainty [*sic*] of his answers or if he just didn't understand sort of the role of judging credibility. But I got the sense from [*sic*] that maybe he didn't understand judging credibility or what's involved. I have to be frank. I got the same sense from [Juror No. 8294]. It was the court's sense, upon questioning by both sides, that that juror seemed to indicate a problem with the role in judging credibility or difficulties for him doing that. That was the sense that I got from these individuals. I just wanted that to be part of the court's observation. I think these are race neutral reasons."

The court denied the motion, concluding "all taken, the totality of the individuals' answers, I'm not finding a *Batson* violation."

14

## II. Governing Law

"The law is clear and firmly established. "'Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race.'" [Citation.] "'Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.'" [Citation.] The law also recognizes "'a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." [Citation.] "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. [Citation.] 'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].'"'" [Citation.]" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759-760.)

"[W]here (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines

15

that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling." (*People v. Scott* (2015) 61 Cal.4th 363, 391 (*Scott*).)

At the first stage, the defendant must set forth a prima facie case of discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." (*Scott*, *supra*, 61 Cal.4th at p. 383.)  The bar is relatively low; "[i]t is satisfied simply by evidence sufficient to permit us to draw an inference that discrimination may have occurred." (*People v. Battle* (2021) 11 Cal.5th 749, 773.)  The ultimate issue is not whether there is systematic exclusion of a protected class, but rather whether a particular panelist has been challenged on the basis of group bias.  (*Ibid.*)

Applying the substantial evidence standard of review, "[w]e examine the entire record before the trial court to determine whether it supports an inference of such group bias." (*People v. Battle*, *supra*, 11 Cal.5th at pp. 772-773.)  Facts particularly relevant to this showing include "that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of jurors belong." (*Scott*, *supra*, 61 Cal.4th at p. 384.)  We also may consider nondiscriminatory reasons for the challenge that are "apparent from and 'clearly established' in the record." (*Ibid.*)  We "may not rely on a prosecutor's statement of reasons to support a trial court's finding that the defendant failed to make out a prima facie case of discrimination." (*Id.* at p. 390.)

## III. Analysis

Appellant argues first that we "may ignore the first step of the *Batson* inquiry and proceed directly to the third step." We disagree. We skip the first step of the inquiry where the court does not make a prima facie finding or makes the finding only after the prosecutor provides his or her reasons for striking the juror. (*People v. Hardy* (2018) 5 Cal.5th 56, 76; *Scott, supra,* 61 Cal.4th at p. 387 fn. 1.) Here, the trial court unambiguously found that defense counsel failed to make a prima facie showing before asking the prosecutor to place his reasons for the strikes on the record. This is the precise situation described in *Scott*, and we accordingly follow the Supreme Court's directive to begin our analysis at the first stage. (See *Scott, supra,* 61 Cal.4th at p. 391.)

Appellant next contends there was sufficient evidence from which the trial court could and should have drawn an inference of discrimination at the prima facie stage. Specifically, he asserts that the prosecutor challenged all three Black jurors and used a disproportionate number of his peremptory challenges, three out of six or 50 percent, to strike Black jurors, who constituted a much smaller percentage of the venire.

This argument turns the substantial evidence standard of review on its head. The issue is not whether substantial evidence would support a contrary finding, but whether substantial evidence supports the trial court's finding. We find that it does. Viewed as a whole, the record in this case clearly establishes nondiscriminatory reasons for excusing Juror No. 0468 and Juror No. 3841 that dispel any inference of bias.

Although both jurors were Black, and the prosecutor struck all three Black jurors who had been through voir dire, those facts

alone are not dispositive.  (See *People v. Parker* (2017) 2 Cal.5th 1184, 1212; *People v. Bonilla* (2007) 41 Cal.4th 313, 343.) We also consider that appellant, who is Hispanic, was not a member of the racial group at issue.[6]  (See *Scott, supra,* 61 Cal.4th 384.) Most important on this record is the prosecutor's engagement of both jurors in "more than desultory" voir dire relevant to key issues in the case: witness credibility and self-defense.  During lengthy exchanges with both the prosecutor and defense counsel, Juror 3841 repeatedly said he was unable to assess credibility or discern whether people were lying or telling the truth.  Adding to remarks by another prospective juror, Juror No. 0468 indicated that she took an expansive and purely subjective view of self-defense:  "if you are in a situation and you feel that your life is either [*sic*] coming to an end, I say fight for your life."  These statements strongly support the court's conclusion that the prosecutor did not exercise his peremptory challenges based on impermissible criteria.  Indeed, the court noted that the prosecutor struck a non-Black juror who made similar comments about her inability to assess credibility.

The totality of the circumstances here supports the court's finding that appellant did not present a prima facie case of discrimination.  We accordingly do not reach the parties' arguments concerning the third step of the *Batson/Wheeler* inquiry.

---

[6]     The race of the victim may also be relevant, but J.D.'s race is not apparent from the record.  (See *Scott, supra,* 61 Cal.4th at p. 384.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


CURREY, P.J.


MORI, J.

19